## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**ELIZABETH KRESS,**                          :

                    **Plaintiff**       :     **CIVIL ACTION NO. 3:05-0566**

      **v.**                            :          **(JONES, D.J.)**
                                                   **(MANNION, M.J.)**
**BIRCHWOOD LANDSCAPING,**          :

            **Defendant**               :

## REPORT AND RECOMMENDATION

Before the court is the defendant's motion for summary judgment.  For the following reasons, the court recommends that the motion for summary judgment be granted in part and denied in part and the plaintiff's complaint be dismissed in part and proceed to trial on counts one, four in part, and five.

## I.    Procedural History

The plaintiff commenced the instant action on March 21, 2005, by filing a complaint against the defendant, her former employer.  (Doc. No. 1.)  The complaint raises seven counts based on gender and pay discrimination.  In count one, the plaintiff alleges that the defendant subjected her to a hostile work environment on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended. In count two, the plaintiff alleges that she endured quid pro quo sexual harassment from the defendant in violation of Title VII.  In count three, the plaintiff alleges that the defendant retaliated against her for exercising her Title VII rights in violation of Title VII.  In count four, the plaintiff alleges that the defendant discriminated

against her on the basis of her gender by not providing equal pay, in violation

of her rights under the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. §206(d). In

count five, the plaintiff raises the Title VII gender discrimination allegations

under the Pennsylvania Human Relations Act of 1955 ("PHRA"), 43 PA. CON.

STAT. ANN. § 951 et seq., as amended.[1]  In count six, the plaintiff alleges that

the defendant constructively discharged her by subjecting her to gender and

age discrimination. Finally, in count seven, the plaintiff alleges that the

defendant intentionally inflicted emotion distress in violation of the common

---

[1]The court notes with perplexion the progress of this claim in the parties' submissions to it. In the complaint, the plaintiff labels count five as an age discrimination claim under the PHRA. In its motion for summary judgment, the defendant argues that the plaintiff has failed to exhaust her administrative remedies under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq., and does not at all address the PHRA. In her brief in opposition, the plaintiff indirectly admits to poorly editing the complaint by stating that "it is obvious from the contents of the claims" that she is raising a claim of sex discrimination, not age discrimination, under the PHRA.  (Doc. No. 30 at 15.)  The plaintiff is correct: It is clear from the allegations that the PHRA claim is based on sex and not age.

The plaintiff also contends that, because the defendant argued on the basis of age, not sex, discrimination, it has waived any argument on the PHRA claim.  The court agrees.  The plaintiff states in the complaint:

> The Defendant violated the Pennsylvania Human Relations Act in discriminating against the Plaintiff because of her sex and subjecting her to a hostile environment Quid pro quo treatment, retaliation for having reported the sexual harassment and pay equal to male employees.

(Doc. No. 1 at ¶ 44.)  The defendant should have discerned by reading the allegations in count five that it raises the same claims as in the Title VII counts under the PHRA and properly addressed them instead of basing its argument for summary judgment on an incorrect caption, which is not even a required part of a complaint in Federal court. Accordingly, the court finds that the defendant has waived any argument for summary judgment with respect to the plaintiff's PHRA claim and recommends that the defendant's motion for summary judgment be denied with respect to this claim.

2

law of Pennsylvania.  The plaintiff seeks damages and equitable relief.  The defendants answered the complaint on July 7, 2005.  (Doc. No. 3.)

After discovery, the defendant moved for summary judgment on August 18, 2006. (Doc. No. 19.) It submitted a brief in support of the motion, a statement of facts, and supporting exhibits on August 18 and 22, 2006.  (Doc. Nos. 20-22.)  The plaintiff submitted a brief in opposition, a counter-statement of facts, and supporting exhibits on November 2 and 3, 2006.  (Doc. Nos. 30-32.)  On December 8, 2006, the defendant submitted a reply brief and two affidavits.  (Doc. Nos. 36-38.)  On December 29, 2006, the plaintiff, by leave of the court, submitted a sur-reply.  (Doc. No. 41.)

In its motion, the defendant raises six arguments.  First, the defendant argues that it is not an employer covered by Title VII.  Second, the defendant argues that the plaintiff failed to establish, as a matter of law, a hostile work environment, quid pro quo harassment, or a retaliation claim under Title VII. Third, the defendant argues that the plaintiff failed to establish, as a matter of law, a pay discrimination claim under the EPA.  Fourth, the defendant argues that the plaintiff failed to establish, as a matter of law, an age discrimination claim under the PHRA.  Fifth, the defendant argues that the plaintiff failed to establish, as a matter of law, that it constructively discharged the plaintiff. Finally, the defendant argues that the plaintiff failed to establish, as a matter of law, an intentional infliction of emotion distress ("IIED") claim.

The matter having been briefed, it is ripe for disposition. The court

3

exercises jurisdiction over the Federal claims under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3) and pendent jurisdiction over the state-law claim under 28 U.S.C. § 1367.

## II.    Standard of Review

Summary judgment is appropriate when the pleadings and any supporting materials show that there are no material issues of fact to be resolved and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); see Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Furthermore, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324; Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990); Pastore v. Bell Tel. Co. of Pennsylvania, 24 F.3d 508, 511 (3d Cir. 1994) (quoting Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue of any material fact, but the

4

nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in the pleadings.  Celotex Corp., 477 U.S. at 323, 325; Anderson v. Liberty Lobby, Inc., 477 U.S. 248-52 (1986); Young  v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992). The nonmoving party cannot counter the movant's specific facts with general averments; rather, specific fact must rebut specific fact. Lujan, 497 U.S. at 888; see id. ("The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

To determine whether the nonmoving party has met its burden, the court must focus on both the genuineness and the materiality of the factual issues raised by the nonmovant. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 242, 247-48 (emphasis in original).  A dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  Anderson, 477 U.S. at 250.  A disputed fact is material when it could affect the outcome of the suit under the governing substantive law. Anderson, 477 U.S. at 248. If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986) (quoting First Nat'l

Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). All inferences, however, "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Pastore, 24 F.3d at 512 (quoting Big Apple BMW, Inc. v. BMW of N. America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)).  But "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." Lujan, 497 U.S. at 888 (internal quotation omitted).

## III.   Factual Background

With the standard for summary judgment in mind, the court has compiled from the defendants' statement of facts and the plaintiff's counter-statement of facts (Doc. Nos. 21 & 31) and, as necessary, the evidence on which they are based, the following pertinent factual background to the case.[2] The court has accepted as true all of the defendant's facts, not disputed by the plaintiff.  When the plaintiff has denied the defendants' averment, the court has examined the evidence on which the averment and denial are purportedly based.  If the evidence does not support the averment, the court

---

[2]Both parties state various allegations going to the opposing party's credibility. However, it is not the court's function to make credibility determinations in a motion for summary judgment, indeed it is impermissible.

6

has accepted the plaintiff's denial and rejected the averment in its consideration of the motion. If the evidence supports the averment, in spite of the plaintiff's denial, the court has accepted the averment in its consideration of the motion because the plaintiff has failed to meet her burden of rebutting the defendant's evidence with more than unspecified and unsubstantiated allegations. The court has drawn any inferences in the plaintiff's favor.

The plaintiff began working for the defendant, a sole proprietorship of Joseph Czarnecki, on August 11, 2002. (Doc. No. 21 ¶¶ 3 & 6.) Prior to working at the defendant, the plaintiff had worked at two other garden centers for approximately eight months each, earning $8.00 per hour at one and $7.25 per hour at the other. (Doc. No. 21 ¶¶ 8 & 9.) In both jobs, the plaintiff worked in garden center sales. (Doc. No. 21 ex. E at 3.) At the one garden center, the plaintiff's duties consisted of "selling plants, fertilizers and anything anybody needed to correct soil PH, firewood, selling stone, figuring out square footage, you name it. People would ask my opinion on using different plants, different applications so I did help out with knowledge that I had in designing."[3] (Doc. No. 32 ex. II, pl's aff. at ¶ 4.) At both jobs, the plaintiff

---

[3]With respect to both parties' affidavit, the court notes that various affiants include in their affidavits facts and assertions that are clearly not based on personal knowledge. Rule 56(e) mandates that "[s]upporting and opposing affidavits shall be made on personal knowledge." In the future, it would be more appropriate if the parties kept their legal arguments, speculation, and references to outside evidence, out of these affidavits.

would "correct problems customers had with their landscape designs and would substitute the appropriate plant into the right place when they would bring in a drawing." (Doc. No. 32 ex. II, pl's aff. at ¶ 5.)

When she was hired by the defendant, the plaintiff had graduated from high school and earned nine credits towards a paralegal certificate. (Doc. No. 21 ¶ 10.) She noted on her application to the defendant that she was "[h]ighly experienced in plant [and] landscape work." (Doc. No. 21 ex. E at 2.) The plaintiff gained her experience by being "self-taught"; "knowledgeable friends and family"; reading, and learning on her own. (Doc. No. 32 ex. II, pl's aff. at ¶¶ 6-7.) The plaintiff had enjoyed gardening "for over 30 years." (Doc. No. 32 ex. II, pl's aff. at ¶¶ 6-7.)

Initially, the plaintiff worked in the defendant's garden center sales, earning $10.00 per hour. (Doc. No. 21 ¶¶ 6 & 7.) Shortly after beginning her employment with the defendant, the plaintiff was promoted to garden center manager, at which time she received a $.70 per hour raise. (Doc. Nos. 21 ¶ 11, 23 & 32 ex. II, pl's aff. at ¶ 10.) As manager, the plaintiff's duties "included ordering, pricing, watering, maintaining plants and shrubs, garden center sales to customers, which included using the bobcat to load material and ringing up customer sales." (Doc. No. 21 ¶ 12.) The plaintiff "received excellent evaluations." (Doc. No. 32 ex. II, pl's aff. at ¶ 18.) In December 2002, the plaintiff was laid off for the winter season and was rehired in April 2003, at which time she returned to her position as garden center manager.

(Doc. No. 21 ¶ 17.)

The plaintiff avers that she was sexually harassed by Mr. Czarnecki from the time she was hired to December 2002. (Doc. No. 21 ¶¶ 13, 14.)  She also avers that Mr. Czarnecki continued to harass her after she returned until her resignation in August 2003.  (Doc. No. 21 ¶ 25.)  The defendant claims that "[t]here were no witnesses to any of the alleged harassment or formal objections made by Kress."  (Doc. No. 21 ¶ 15.)  The plaintiff denies the statement.  (Doc. No. 31 ¶ 15.)  The court's searching review of the record has found some substantiated evidence concerning the plaintiff's sexual harassment allegations. This evidence, however, varies widely in alleged seriousness.

Mr. Czarnecki sent the plaintiff a card, in which he wrote, "I feel as if you are an Angel sent to help me." (Doc. No. 32 ex. D.)  He also gave the plaintiff a note saying, "ORDER POOL SAND," on which he drew a smiley face, a fish, and a heart.[4]  (Doc. No. 32 ex. E.)

The plaintiff's daughter swore in an affidavit that she opened a card, postmarked August 26, 2003, sent by Mr. Czarnecki to the plaintiff after she had resigned that was "crude," "degrading," and "disgusting." (Doc. Nos. 31

---

[4]There is also a note from Katelyn Cook, who was a part-time accounts payable clerk at the defendant in the summer of 2003, to Mr. Czarnecki which has a heart, a fish, and a smiley face. Mr. Czarnecki was not sure if he or Ms. Cook had drawn the symbols.  (Doc. Nos. 22 ex. CC, Czarnecki dep. at 62-63; 30 ex. F.)  The plaintiff contends that Mr. Czarnecki drew the symbols before passing the note on to her.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(p).)

¶ 15 & 32 ex. C, Amii Kress aff. at ¶ 3.)   According to the daughter, the plaintiff was "visually upset."  (Doc. Nos. 31 ¶ 15 & 32 ex. C, Amii Kress aff. at ¶ 3.)  The plaintiff has submitted a copy of the greeting card.  The picture on the outside of the card shows a doctor looking through a magnifying glass at the region between the hip bones and below the spinal column on an X-ray of a skeleton and saying, "We think it might be this little thing right here between the legs."  (Doc. No. 32 ex. G.)  Inside, the card is inscribed, "The search for man's brain continues . . . ."  Mr. Czarnecki's message began, "When I saw this card, I smiled [and] thought of you w/ regard to our past conversations on this topic.  Hope you find it as humorous as I have."  (Doc. No. 32 ex. G.)  He concluded, "Good luck in your future endeavors.  You most certainly have the intelligence, knowledge [and] work ethic.  Best wishes, Joe Czarnecki."[5]  (Doc. No. 32 ex. G.)

In addition, the plaintiff swore in her affidavit to other incidents of harassment.[6]  Mr. Czarnecki repeatedly asked the plaintiff to dinner,

---

[5]The daughter also recounted an incident in which she went to the defendant with her mother and saw a picture of her mother on the wall with a caption to the effect of "is that a plant under her sweatshirt?". (Doc. Nos. 31 ¶ 15 & 32 ex. C, Amii Kress aff. at ¶ 3.)  The daughter stated that her mother was "appalled" and affected for several days. (Doc. Nos. 31 ¶ 15 & 32 ex. C, Amii Kress aff. at ¶ 3.)  However, the court cannot credit this as evidence of possible sexual harassment because, in the plaintiff's counter-statement of facts, she states that the picture was meant to "accus[e] Plaintiff of stealing." (Doc. No. 31 ¶ 15.)

[6]The court has omitted the details of certain of the incidents mentioned here and has, furthermore, not listed every one of the voluminous list of incidents to which the plaintiff swears.  The incidents recited here are

racquetball, and skiing, including overnight ski trips.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(a), (d).)  He told the plaintiff that he "wanted to take our relationship to a high level."  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(b).)  Mr. Czarnecki "would make excuses to take rides with [the plaintiff] alone," leaving the male employees at the job sites, during which he would ask the plaintiff out.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(d).)  On one occasion, Mr. Czarnecki picked up the plaintiff at a job site to drive her to another.  When the plaintiff got in the car, Mr. Czarnecki told her the car had automatic locks, she would be trapped, and he "could have his way with" her.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(e).)  Mr. Czarnecki also made comments about wanting to "hug and kiss" the plaintiff, such as "wouldn't you just like to kiss her?".  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(f), (h).)  According to the plaintiff, he also asked her in front of Mr. Grosner "why I never touched him"  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(I).)  The plaintiff was "expected to sit in the center" of the pickup truck, between two men.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(n).)  Overhead, according to the plaintiff, was a drawing of male genitalia, which Mr. Czarnecki refused to remove, even after being requested to do so, by the plaintiff.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(n).)  Mr. Czarnecki allegedly gave the plaintiff a calling card so that she could call him on her days off.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(o).)  According to the plaintiff, Mr. Czarnecki frequently engaged in sexual conversations with her and other employees, but she "did not voluntarily

representative of the corpus of alleged harassing acts.

engage in these types of conversations . . . ever!"  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(r)-(z).)  According to the plaintiff, she always rebuffed Mr. Czarnecki's advances and made it known that she found his behavior offensive.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(b), (d), (e), (aa).)

Mr. Czarnecki told the plaintiff that her "job was not in jeopardy if I did not have sex with him," but eventually warned the plaintiff that she would not receive a raise if she was not "nicer" to him.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(c), (g).)  He also told her that, if she was not so knowledgeable about the garden center and landscape industry that he would have laid me off or fired me long ago because I wouldn't date him."  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(g).)  He threatened to replace the plaintiff with Mr. Grosner's wife, who allegedly interviewed for the plaintiff's job.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(j).)

Mr. Czarnecki admits that he possibly made comments to male employees in the plaintiff's presence to the effect of "wouldn't you just like to kiss her." (Doc. No. 22 ex. CC, Czarnecki dep. at 44.) However, Mr. Czarnecki contends that he intended it to mean that the plaintiff had a "cute personality . . . a pixie personality," and not as harassment.  (Doc. No. 22 ex. CC, Czarnecki dep. at 44.)  He concedes, too, that he may have told the plaintiff that he wanted to "give her a kiss and a hug," but only occasionally because of how helpful she was and not because he wanted to date the plaintiff or have sex with her.  It was part of their usual sexually humorous banter.  (Doc.

12

No. 22 ex. CC, Czarnecki dep. at 44-45.)  He further conceded that he likely put hearts, stars, and fish on notes to the plaintiff at least "a couple times." (Doc. No. 22 ex. CC, Czarnecki dep. at 37-38.)  In addition, admitting that the handwriting was his, Mr. Czarnecki admitted that he likely sent the plaintiff the card opened by the plaintiff's daughter.  (Doc. No. 22 ex. CC, Czarnecki dep. at 39-40.)  Further, he stated that he sent the plaintiff other things, as well. (Doc. No. 22 ex. CC, Czarnecki dep. at 40.)  Mr. Czarnecki does not recall having asked the plaintiff out or otherwise harassing her. (Doc. No. 22 ex. CC, Czarnecki dep. at 49-50.)  Mr. Czarnecki also denies telling the plaintiff, after she got in his car, that the doors locked automatically and "she couldn't get out."  (Doc. No. 22 ex. CC, Czarnecki dep. at 51-52.)

Already in 2002, the plaintiff knew that she had the right to complain that she was being harassed, file a complaint with the Pennsylvania Human Rights Commission ("PHRC") concerning sexual harassment, and sue.  But she never formally complained until after she left the defendant.[7]  (Doc. Nos. 21 ¶ 16 & 32 ex. A, pl's dep. at 50-51.)  However, the defendant had not posted any equal employment opportunity ("EEO") or harassment notices of rights. (Doc. No. 32 ex. II, pl's aff. at ¶ 19(l).)

The plaintiff states that she often mentioned to Ms. Blandina that Mr.

---

[7]The plaintiff avers that she complained to Elizabeth Blandina, who worked as the defendant's bookkeeper and attorney, during this time.  (Doc. No. 31 ¶ 16.)  But Ms. Blandina only began working for the defendant in April 2003, and the record only supports a finding that the plaintiff complained to Ms. Blandina in 2003.  (Doc. No. 21 ¶ 16 & ex. K, Blandina aff. at 2.)

Czarnecki was a "creep" and informally complained about Mr. Czarnecki's actions.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(cc).)  The plaintiff also mentions two specific instances on which she complained to Ms. Blandina of the harassment: sometime around April or May 2003 and on the day that Ms. Blandina represented the defendant in local court, which the plaintiff states was in June or July 2003.  (Doc. Nos. 32 ex. II, pl's aff. at ¶ 19(bb), (cc); 41 ex. 1, pl's supp. aff. at ¶¶ 4, 6.)  The latter occasion constituted, according to the plaintiff, an official complaint.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(cc).)  She further claims that Ms. Blandina agreed that Mr. Czarnecki had sexually discriminated against her, but in the context of the pay disparity, not sexual harassment.  (Doc. Nos. 31 ¶¶ 16, 26; 30 ex II, pl's aff. at ¶ 19(bb), (cc).)

But Ms. Blandina swears that the plaintiff never formally complained of being harassed, but had merely "casually remarked" that Mr.  Czarnecki had asked her out.  She also disputes the plaintiff's contention that they spoke concerning the alleged harassment before mid-August 2003.  She further states that she never agreed that Mr. Czarnecki has sexually discriminated against the plaintiff, but had simply corrected the plaintiff's use of the term "sexual harassment" to indicate, without approval, that a pay disparity would properly be termed "sexual discrimination."  (Doc. No. 21 ex. K, Blandina aff. at 2-3.)  Ms. Blandina also states that Mr. Czarnecki never considered replacing the plaintiff with Mr. Grosner's wife, but rather interviewed her to work on weekends, when the plaintiff did not work.  (Doc. No. 36, Blandina

supp. aff. at 2.)

In addition, the defendant claims that the plaintiff often participated in ribald and sexual exchanges with other employees.[8] (Doc. No. 21 ¶ 33.) Ms. Blandina swears that during her first week at the defendant, the plaintiff told her that a male employee, Brad Malecki, "was the most perfect man she had ever seen, especially when he was shirt-less." (Doc. Nos. 21 ex. K, Blandina aff. at 3; 36, Blandina supp. aff. at 1.) She also states that the plaintiff had willingly engaged in numerous other "conversations of a sexual nature" with Mr. Czarnecki and other employees. (Doc. No. 21 ex. K, Blandina aff. at 3.) She cannot recall specific instances of such conversations, but does "know it was constant." (Doc. No. 21 ex. K, Blandina aff. at 3.) She recalled one instance where the plaintiff joked about men's heads being between their legs and another instance where the plaintiff commented to a male employee, Ryan Levy, about his sexy body. (Doc. No. 21 ex. K, Blandina aff. at 3.)

---

[8] The plaintiff claims that Mr. Czarnecki paid the defendant's affiants for their affidavits and that Mr. Czarnecki cannot be trusted. (Doc. No. 31 ¶ 32.) However, she has offered no evidence for this claim that the affidavits were purchased. The affidavits have been properly sworn to by the affiants, based on personal knowledge, and to the extent they are relevant to the instant motion, the court will give them due credit, just as it has done to the plaintiff's and the plaintiff's daughter's affidavits. The plaintiff has offered evidence of Mr. Czarnecki's previous criminal charges and her averments of specific alleged incidents that indicate his untrustworthiness. However, as noted above, the court may not weigh the parties' or their witnesses credibility and without specific evidence that would cast doubt, and not mere aspersions, on the validity of the affidavits and other of the defendant's evidence here, the court will consider them in accordance with the standard for summary judgment.

James Grosner, a landscape designer who worked for the defendant in 2003, also swears to similar events.  (Doc. No. 21 ex. M, Grosner aff. at 3.) He recalls "several occasions" when the plaintiff and Mr. Czarnecki, and other employees, "bantered back and forth with Ms. Kress being more than a willing participant to discuss topics of a sexual nature."  (Doc. No. 21 ex. M, Grosner aff. at 2.)  He recalls the plaintiff's sexual comments to Messrs. Malecki and Levy.  With respect to the allegation that the plaintiff was forced to sit between two men in a truck, Mr. Grosner swears that the plaintiff made it known that she was "more than happy to sit in the middle."  (Doc. No. 21 ex. M, Grosner aff. at 2.)

Ms. Cook recalls a similar pattern of sexual humor at the defendant. (Doc. No. 21 ex. N, Cook aff. at 2.)  On one occasion, when she, employee Jennifer Pica, Mr. Czarnecki, and the plaintiff were in the office, the plaintiff asked Mr. Czarnecki, "'if there was a wet T-shirt contest now, who would win?' Mr. Czarnecki responded with 'I think they have you beat.'"  (Doc. No. 21 ex. N, Cook aff. at 2.)  Everyone laughed in response.  (Doc. No. 21 ex. N, Cook aff. at 2.)  On another occasion, Ms. Cook swears that the plaintiff told her that she and the plaintiff could take their shirts off because the male employees did.  (Doc. No. 21 ex. N, Cook aff. at 2.)

Ms. Pica, who was a part-time accounts receivable clerk in the summer of 2003, recounts substantially similar events as Ms. Blandina, Mr. Grosner, and Ms. Cook.  (Doc. No. 21 ex. O, Pica aff. at 2.)  She swears to the

16

conversation about the wet T-shirt contest. She recalls the plaintiff commenting to Mr. Levy about his body. She also recalls the plaintiff remarking that she was happy to sit between two men in the truck. (Doc. No. 21 ex. O, Pica aff. at 2.)

Mr. Malecki, who worked with the plaintiff during the summer of 2003, recalls the plaintiff's engagement in sexual conversation. (Doc. No. 21 ex. P, Malecki aff. at 2.) He states that once, when he and the plaintiff were alone, the plaintiff remarked "that there was only one thing better than chocolate, and that's sex." (Doc. No. 21 ex. P, Malecki aff. at 2.)

Michael Ostopick, a laborer at the defendant hired in 2003, swears: "I was admiring a Hummer Jeep. Ms. Kress remarked to me that 'she would give me a hummer if I wanted one.' I understood that a hummer indicated oral sex." (Doc. No. 21 ex. Q, Ostopick aff. at 2.) During the investigation into the plaintiff's allegations by the PHRC, when asked whether he had seen Mr. Czarnecki sexually harass the plaintiff, Mr. Ostopick replied, "if anything it was the other way around." (Doc. No. 21 ex. Q, Ostopick aff. at 2.) Mr. Czarnecki, too, recalls that the plaintiff willingly engaged in sexual conversations. (Doc. No. 22 ex. CC, Czarnecki dep. at 40-45, 49-51.)

In the late summer and fall of 2002, the plaintiff began working on landscaping projects at clients' homes. (Doc. Nos. 21 ¶ 21 & 31 ¶ 21.) She states she worked on about ten job sites, "cutting back" plants and shrubs. (Doc. No. 32 ex. II, pl's aff. at ¶ 9.) When she began working with the

17

grounds maintenance crew, she earned $12.70 per hour.  (Doc. No. 21 ¶ 23.) However, it is not customary at the defendant to give raises upon an employee's changing duties.  Rather, raises are given "upon return for a new year, upon evaluation and assessment of their abilities after hiring, and later in the season after they have settled in or been permanently promoted." (Doc. No. 21 ex. K, Blandina aff. at 3-4.)

According to the plaintiff, sometime in 2003, Mr. Czarnecki had the plaintiff take a new, inexperienced employee to a job site to train him.  (Doc. No. 32 ex. II, pl's aff. at ¶ 13.)  The plaintiff began working as a mini-grounds maintenance foreman in July 2003, replacing Ed Elliott.  (Doc. No. 32 ex. II, pl's aff. at ¶ 14.) Mr. Czarnecki taught the plaintiff "how to write the billings, the rates for landscape laborers and how they were designated a truck for the day . . . .  I received the customer list for the day, what was to be done at their house and what needed to be loaded on to the truck."  (Doc. No. 32 ex. II, pl's aff. at ¶ 14.) According to the plaintiff, Mr. Elliot received $13 per hour.[9]  (Doc. No. 32 ex. II, pl's aff. at ¶¶ 15-16.)  The defendant denies that the plaintiff ever worked as a grounds foreman.  (Doc. Nos. 36, Blandina supp. aff. at 2; 37, Czarnecki aff. at 1.)

According to the plaintiff, in August 2003, the plaintiff replaced James

---

[9]The plaintiff claims that Messrs. Elliot and Grosner, among others, were paid under the table. For the purposes of resolving the instant motion, whether or not the defendant paid any employees illegally is not relevant. Both parties agree that Mr. Grosner made more than the plaintiff, at least $16 per hour.  The exact discrepancy would only be relevant for damages.

Grosner as landscape designer and foreman on a project because a client rejected Mr. Grosner's designs in preference for the plaintiff's designs. (Doc. Nos. 22 ex. CC, Czarnecki dep. at 35; 31 ¶ 24.) Mr. Czarnecki states that the plaintiff only worked outside the garden center on two projects. (Doc. No. 22 ex. CC, Czarnecki dep. at 52.) The defendant denies that the plaintiff was ever a landscape designer or foreman. (Doc. No. 37, Czarnecki aff. at 1.)

Mr. Grosner earned either $16 or $20 per hour.(Doc. Nos. 21 ¶ 38; 32 ¶ 38.) The plaintiff believed that Grosner had no "background or expertise in landscaping." (Doc. Nos. 21 ¶ 43 & 22 ex. F, pl's dep. at 134.) "The only thing [the plaintiff] knew of that he did was lawn mowing service." (Doc. Nos. 21 ¶ 43 & 22 ex. F, pl's dep. at 134-35.) Mr. Grosner had applied to the defendant to be a landscape foreman in 2003. His duties "included building walls, patios, ponds, lawns, large shrubbery beds, landscape design, landscape lighting[,] solicitations, estimates, installation and maintenance of lawn and plant material." (Doc. No. 21 ex. M, Grosner aff. at 2.) He had received a high school diploma in vocational agriculture, had worked in landscaping since 1988, and "came to Birchwood with 15 years experience." (Doc. No. 21 exs. M, Grosner aff. at 2; T; V.) He had experience with fertilizing since 1989 and had his pesticide technician's license when he began working for the defendant. (Doc. No. 21 exs. M, Grosner aff. at 2; V.)

Again, the court has searchingly reviewed the record for evidence concerning the pay disparity. The plaintiff has submitted three phone

message slips from July and August, presumably 2003, each stating that a client desired that additional work be done.  The plaintiff argues that the slips should be read to indicate that she was a foreman because they were directed to her.  (Doc. No. 32 ex. M.)  There is a letter from Mr. Czarnecki to an unknown recipient, written sometime after August 29, 2003, in which he states that "my office staff has been trained to direct your concerns to the appropriate foreman . . . ."  (Doc. No. 32 ex. V.)  The plaintiff has submitted two project invoices. One lists her as the foreman. The other has no indication of who the foreman was.  (Doc. No. 32 ex. M.)  The plaintiff signed and returned a note from Mr. Czarnecki telling her how to charge for labor on a project.  (Doc. No. 32 ex. M.)  The plaintiff has submitted two sheets with rough drawings of landscaping projects.  One sheet has the plaintiff's name on it, but not in any way indicating that she is a foreman.  (Doc. No. 32 ex. N.)

The plaintiff has submitted what she claims is a quiz given to her by Mr. Czarnecki to test her math skills.  On the basis of the quiz, the plaintiff claims she was promoted to Mr. Grosner's job, but did not receive his pay. She contends that he often quizzed her, but she never saw him quiz the men.  She states that she did not keep any other quizzes.  (Doc. No. 32 ex. T.)  But, Mr. Grosner swears that Mr. Czarnecki often quizzed employees who had to perform work that required them to calculate various measurements.  (Doc. No. 21 ex. M, Grosner aff. at 2.)

Around August 15, 2003, the plaintiff complained to Ms. Blandina about

the pay discrepancy. (Doc. Nos. 31 ¶ 26.) According to Ms. Blandina, the plaintiff complained to her one day after she had punched out and was leaving work, about the pay disparity.  Ms. Blandina states that the conversation lasted less than one minute and the plaintiff did not apprise[ her] of all the facts."[10]  (Doc. No. 21 ex. K, Blandina aff. at 2.)  In addition, on her time card for the week ending August 17, 2003, the plaintiff wrote a demand for Jay Grosner's pay rate stating: "Jay's pay for Jay's work or lay me off or fire me please." (Doc. Nos. 21 ¶¶ 36, 44 & 32 ex. AA.)  The plaintiff later asked Ms. Blandina if she had received the time card with the note. Ms. Blandina said she had, but would have to talk to Mr. Czarnecki about it because she lacked the authority to give a pay raise.  Mr. Czarnecki was on vacation at the time, and Ms. Blandina never had an opportunity to talk to him before the plaintiff resigned. (Doc. No. 21 ex. K, Blandina aff. at 2.)

Mr. Czarnecki was on vacation until August 20, 2003. When he returned to the defendant on August 21, 2003, he "was given an ultimatum" by Betsy Kress to pay her the landscaping foreman's rate of pay." (Doc. No. 37, Czarnecki aff. at 1.)  Mr. Czarnecki rejected the ultimatum because the plaintiff was not a foreman and was not as qualified as Mr. Grosner. (Doc. No. 37, Czarnecki aff. at 1.)  That same day, the plaintiff resigned from the defendant.  (Doc. No. 21 ¶ 45.)  She submitted a letter to Mr. Czarnecki that

---

[10]This is the conversation referred to above that the plaintiff cites as substantiating her claim that she discussed her alleged sexual harassment with others.

stated, "Because of a disagreement we have had over equal pay for equal work I am hereby submitting my letter of resignation." (Doc. No. 21 ¶ 45.)  In a letter dated August 26, 2003, Mr. Czarnecki told the plaintiff, "You act as if I have treated u unfairly w/ respect to your hourly wage.  I don't understand, tho, since we always gave u the amount agreed on.  At the end, when u were emphatic about a raise, I was willing to give it to you w/ the stipulation that u take a helper + charge $35.00/hr." (Doc. No. 32 ex. EE.)

The plaintiff claims that Mr. Czarnecki continued to harass her after she resigned by delaying her final paycheck.  (Doc. No. 32 ex. II, pl's aff. at ¶ 19(ff).) On August 29, 2003, the plaintiff left a letter for Mr. Czarnecki with Mr. Grosner, complaining that she had not received her final paycheck and had "asked for it and have stopped by 4 times for it."  (Doc. No. 32 ex. O.)  She added that she would seek legal redress. (Doc. No. 32 ex. O.) The plaintiff got her final paycheck on September 30, 2003.  The check had a $900 deduction for plants, which the plaintiff claims was from an IOU on which Mr. Czarnecki had forged the plaintiff's name.  (Doc. No. 32 ex. R.)  The plaintiff has submitted an invoice with the plaintiff's name and an order for $900's worth of plants. The plaintiff's first name is signed beneath the order, in handwriting that does not match the order. (Doc. No. 32 ex. P.) The plaintiff received invoices for $900 in October, November, and December 2003.  The plaintiff contends that the invoices, like the conception of the $900 charge, were meant by Mr. Czarnecki to harass her after she had resigned and complained

22

to the authorities. (Doc. No. 32 ex. S.) Mr. Czarnecki believed that the plaintiff had stolen $900 worth of plants and took the money as recompense. (Doc. No. 22 ex. CC, Czarnecki dep. at 48-49.) Ms. Pica swears that the invoices were sent by her because she did not know that the money had already been deducted from the plaintiff's paycheck. (Doc. No. 21 ex. O, Pica aff. at 2.) Mr. Czarnecki also sent the card that was opened by the plaintiff's daughter. (Doc. No. 32 ex. II, pl's aff. at ¶ 19(ff)(iii).) The plaintiff further alleges that Mr. Czarnecki harassed her on two other occasions when he encountered her in public. (Doc. No. 32 ex. II, pl's aff. at ¶ 19(ff)(I), (ii).)

The plaintiff subsequently complained to the EEOC and the PHRC in September and October 2003 and the Bureau of Wages and Labor at an unknown time. (Doc. Nos. 21 exs. L, Y, Z, AA, BB; 31 ¶ 16.) In the employment experience section of the forced resignation questionnaire submitted to the PHRC, the plaintiff stated her reason for leaving the defendant was that she "[w]as promoted to Landscape Foreman but didn't get his wages." (Doc. No. 21 ¶ 47 & ex. Y.) In the allegations section of the questionnaire, the plaintiff explained that she did not receive the "wages and benefits" that Mr. Grosner received. (Doc. No. 21 ex. L at 3.) She stated that the "specific[] act" that forced her to resign was that "Joseph Czarnecki refused to give me the "Landscape Foreman" pay for doing the "Landscape Foreman" job." (Doc. No. 21 ¶ 48 & ex. L at 4.) She stated that she "had no choice but to resign" because her "job at the Garden Center was not

'profitable' and [she] was forced into the 'Landscape Foreman' job because the customer did not like the present 'Landscape Foreman' [and] Joe Czarnecki did not want to lose this job."  (Doc. No. 21 ¶ 49 & ex. L, at 4.)  She further stated that the "specific[] reason" she resigned was that she "wanted equal pay for equal work."  (Doc. No. 21 ¶ 50 & ex. L, at 5.)  But in the questionnaire, the plaintiff also complained that Mr. Czarnecki retaliated against her "because I would not date him and he told me I could get a raise if I was dating him."  (Doc. No. 21 ex L at 3.)

The plaintiff's letters to the EEOC and the Bureau of Wages and Labor also state that she resigned because of "an equal pay for equal work disagreement." (Doc. No. 21 exs. Z; AA.) However, in her complaint filed with the EEOC and the PHRC, the plaintiff raised the allegations of sexual harassment, retaliation, pay discrimination, and constructive discharge, raised here.  (Doc. No. 21 ex. BB.)

## IV.    Discussion

### A.    Title VII

#### 1.    Covered Title VII Employer

Title VII provides, in pertinent part, that "it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).  It further provides that it is unlawful for an employer "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex . . . ." Id. § 2000e-2(a)(2). The restrictions and protections provided by Title VII apply, as relevant to this case, only to an employer. Under Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." Id. §2000e(b).  The term "current or preceding calendar year" means the year in which the alleged discrimination occurred or the year prior to the alleged discrimination. Komorowski v. Townline Mini-Mart and Rest., 162 F.3d 962, 965 (7th Cir. 1998) (per curiam) ("[D]efining 'current calendar year' as the year in which the alleged Title VII violation occurred is a common sense reading of the language of § 2000e(b)."); see Vance v. Union Planters Corp., 209 F.3d 438, 446 (5th Cir. 2000) (current year refers to year in which alleged discrimination occurred); cf. Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 205 (1997) (stating without discussion that applicable years are years of, and prior to, alleged discrimination); Equal Employment Opportunity Comm'n v. Hesco Parts Corp., 57 Fed.Appx. 518, 522 (3d Cir. 2003) (not precedential) (holding that the ADA, which has the same "current or proceeding year"

25

language as Title VII, means year of, or prior to, alleged discrimination).

Here, the court finds that the defendant has failed to show that it employed fewer employees than necessary to subject it to Title VII. The defendant's evidence consists of an affidavit from a certified public accountant, who looked at the defendant's tax records from 2003 and 2004 and its employee earnings summaries from March 31, 2003, through December 31, 2004. However, the plaintiff's allegations concern 2002 and 2003. Thus, the relevant period–the "current or preceding calendar year"–is 2001, 2002, and 2003. The defendant's evidence does not show whether or not it employed the threshold number of employees to be covered by Title VII in 2001 or 2002. If the defendant employed more than fifteen employees for twenty or more weeks in 2001 or 2002, it would be covered by Title VII. Accordingly, the court finds that there is a genuine issue of fact as to whether the defendant is a covered Title VII employer and the defendant's motion for summary judgment should be denied with respect to this claim.

### 2.    Hostile Work Environment[11]

---

[11]Hostile-workplace harassment and quid pro quo harassment are complementary species of Title VII claims. See Ellerth, 524 U.S. at 753-54 ("When a plaintiff proves that a tangible employment action resulted from a

As part of its protections against sex-based discrimination, Title VII prohibits "unwelcome sexual conduct [that] unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment." <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 425-26 (3d Cir. 2001) (citing <u>Meritor Savs. Bank FSB v. Vinson</u>, 477 U.S. 57, 65 (1986)). The Court of Appeals for the Third Circuit has developed a framework for analyzing hostile workplace claims:

---

refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive."). The distinction between the two types of claims lies in whether or not threats are made and carried out. Hostile-workplace claims either lack threats or consist of unrealized threats. <u>Quid pro quo</u> claims consist of realized threats. <u>Id.</u> at 751-754. "The principal significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive." <u>Id.</u> at 752. However, the distinction is of "limited utility" beyond providing a "rough demarcation," which allows the court to determine whether there is a <u>prima facie</u> case of discrimination. <u>Id.</u> at 751; <u>see id.</u> at 753 ("To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII.").

In <u>Ellerth</u>, the Supreme Court discussed the distinction between the two types of claims, but recognized that it was irrelevant to the issue before it, which concerned vicarious liability, not the <u>prima facie</u> case. <u>See id.</u> at 754 ("When we assume discrimination can be proved, however, the factors we discuss below, and not the categories <u>quid pro quo</u> and hostile work environment, will be controlling on the issue of vicarious liability."); <u>infra</u>, n.6. (Interestingly, in <u>Ellerth</u>, the Supreme Court found the case before it to be a hostile work environment claim, whereas, below, a majority of the Court of Appeals, sitting <u>en banc</u>, had found the case to be a <u>quid pro quo</u> claim. <u>See</u> 524 U.S. at 749-51, 754.) In this case, the separation is relevant because the court addresses whether or not the plaintiff has made out a <u>prima facie</u> case.

Five constituents must converge to bring a successful claim for a sexually hostile work environment under Title VII:(1) the employee suffered intentional discrimination because of their sex, (2) the discrimination was [severe or] pervasive . . . ,[12] (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of respondeat superior liability.

Weston, 251 F.3d at 426 (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990)). With respect to the first factor, "intentional discrimination is implicit in cases involving 'sexual propositions, innuendo, pornographic materials, or sexual derogatory language'" and, therefore, "the intent to discriminate 'should be recognized as a matter of course.'" Suders v. Easton, 325 F.3d 432, 441 (3d Cir. 2004), overruled on other grounds by Pennsylvania State Police v. Suders, 542 U.S. 129, 142-43 (2004) (quoting Andrews, 895 F.2d at 1482 n.3).

With respect to the second factor, to determine whether alleged acts of sexual discrimination are severe or pervasive enough to create a hostile work environment, the court must consider the totality of the circumstances underlying the claim. Morgan, 536 U.S. at 116. A hostile work environment claim focuses on "a series of separate acts that collectively constitute one 'unlawful employment practice,'" and not individual acts. Nat'l R.R. Passenger

---

[12]The Third Circuit originally stated the element as requiring "pervasive and regular" discrimination, but it recognized that the Supreme Court used a disjunctive "severe or pervasive" standard. "The difference is meaningful, and the Supreme Court's word controls . . . ." Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir.), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, – U.S. –, 126 S.Ct. 2405 (2006).

Corp. v. Morgan, 536 U.S. 101, 115-117 (2002) (quoting 42 U.S.C. §2000e-5(e)(1)). To be actionable under Title VII, the acts must create a "workplace [that] is permeated with 'discriminatory intimidation, ridicule, and insult." Id. at 116 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); Weston, 251 F.3d at 426. This means that the acts are "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Morgan, 536 U.S. at 116 (quoting Harris, 510 U.S. at 21); Weston, 251 at 426. In conducting its analysis, the court must consider factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Morgan, 536 U.S. at 116 (quoting Harris, 510 U.S. at 23); Weston, 251 F.3d at 426.

The court's analysis into the severity or pervasiveness of the harassment entails an objective and a subjective component reflected in the third and fourth factors. See Suders, 325 F.3d at 441; Weston, 251 F.3d at 426. With respect to the third factor, the subjective component, the employee must perceive the work environment "as abusive or hostile," Weston, 251 F.3d at 426 (quoting Harris, 510 U.S. at 21-22), and be "demonstrably injured," Suders, 325 F.3d at 441. With respect to the fourth component, the objective component, the circumstances must create "an 'objectively hostile or abusive work environment–an environment that a reasonable person would find

29

hostile.'" <u>Weston</u>, 251 F.3d at 426 (quoting <u>Harris</u>, 510 U.S. at 21-22); <u>see</u> <u>Suders</u>, 325 F.3d at 441.[13]

Here, the court finds that there is a genuine issue of material fact as to whether or not the plaintiff endured severe or pervasive harassment. The intent to discriminate, the first element, is established by Mr. Czarnecki's and the defendant's affiants' admissions that Mr. Czarnecki and his employees regularly discussed sex.  At the very least, there is substantiated evidence of sexual conversation and banter among multiple people, and there is a material factual dispute about whether Mr. Czarnecki privately harassed the plaintiff to be intimate with him.

But the court cannot determine as a matter of law whether the discrimination was severe or pervasive. According to the plaintiff, sex featured frequently in her conversations and interactions at work.  It is unclear, though, whether the sexual content was severe, humiliating or merely offensive, or interfered unreasonably with the plaintiff's work. Mr. Czarnecki and the defendants' affiants do not refute the allegation that the defendant's work environment regularly involved sexual conversations.  Rather, they state that the plaintiff actively participated. Thus, there is a direct conflict between the sworn statements of various parties and witnesses, and the court cannot act as factfinder in situations where the parties' and witnesses' credibility is

[13]The defendant does not argue (and hence does not contest) the fifth element, which in any case would be futile where the defendant is the sole proprietor of the alleged perpetrator, and the court need not discuss it.

determinative of the resolution.

This uncertainty goes to the third and fourth elements, as well. The court cannot adjudge from the record before it whether or not the plaintiff subjectively perceived the defendant's work environment as harassing, or actively and willingly participated in it.  Nor can the court determine that, if the sexual banter between Mr. Czarnecki, the plaintiff and the other employees, occurred as the plaintiff and others swore it did, a reasonable person would not be offended by the extent to which sex pervaded the defendant's work environment.  Accordingly, the court finds that a genuine issue of material fact exists as to whether the plaintiff was subjected to a hostile work environment.  Therefore, the defendant's motion for summary judgment should be denied and the plaintiff's claim proceed to trial with respect to this claim.

### 3.    **Quid Pro Quo Harassment**

Another of Title VII's protections against gender-based discrimination is the prohibition on an employer's carrying out threats in retaliation for an employee's responses to the employer's sexual harassment. Burlington Indus, Inc. v. Ellerth,  524 U.S. 742, 751 (1998). "[A] plaintiff may prove a claim of quid pro quo sexual harassment by showing that 'his or her response to unwelcome advances was subsequently used as a basis for a decision about compensation, [terms, conditions, or privileges of employment].'"  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 282 n.7 (3d Cir. 2000) (quoting

Robinson v. Pittsburgh, 120 F.3d 1286 (3d Cir. 1997), overruled in part on other grounds by White, 126 S.Ct. at 2410, and by Ellerth, 524 U.S. at 753-54 (bracketed addition in original)).[14]   Thus, in a quid pro quo claim, the plaintiff must show that, as a result of unwelcome sexual harassment, she suffered a tangible employment action that is severe enough to implicate Title VII.[15]   Ellerth, 524 U.S. at 753-54; Robinson, 120 F.3d at 1296-97; see Ellerth, 524 U.S. at 753-54 ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."); Robinson, 120 F.3d at 1296-97 ("[T]he consequences attached to an

---

[14]The basis of Robinson's overruling by White is discussed infra, n.17. Robinson was overruled by Ellerth to the extent the Third Circuit had held that a plaintiff could bring a quid pro quo claim even without a tangible employment action.  See Farrell, 206 F.3d at 282 n.7.

[15]The plaintiff contends that a quid pro quo claim need not adduce a tangible employment action. (Doc. No. 30 at 10-11.) This is incorrect.
The court notes that this requirement does not necessarily mean that a hostile work environment claim cannot involve a tangible employment action. However, in a quid pro quo claim, the tangible action is explicitly part of the prima facie case, whereas, by its very nature, a hostile environment claim may not have a tangible employment action. See supra, n.11. In Ellerth, the Supreme Court addressed the issue in respect of an employer's vicarious liability for a supervisor's hostile environment harassment and the availability of affirmative defenses to liability and damages after the fact of harassment had been conceded. 524 U.S. at 754, 760-65. The Court held that an employer may be vicariously liable. Id. at 765. If "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment," the employer is strictly vicariously liable. Id. If the harassment did not culminate in a tangible employment action, then the employer may raise affirmative defenses. Id.

employee's response to the sexual advances must be sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' 42 U.S.C. § 2000e-2(a)(1), or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.' 42 U.S.C. § 2000e-2(a)(2).") (brackets in original). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761.

Here, the court finds that there is no genuine issue of material fact as to whether the plaintiff suffered quid pro quo sexual harassment. The plaintiff's claim fails because she has not identified, by substantiated evidence, any adverse tangible employment action taken by Mr. Czarnecki against her on the basis of her rebuffs to his advances.  The plaintiff has identified alleged threats made by Mr. Czarnecki against her, for example, that she would not receive a raise if she were not nicer and that Mrs. Grosner was being interviewed to replace her.  But there are simply no fulfilled threats. Instead, the plaintiff received excellent reviews, was rehired in 2003 after being laid off for the winter season, was made a landscape foreman, and received nearly a twenty-percent raise (albeit not to the amount the plaintiff

believed she deserved).[16]   Accordingly, the court finds that no reasonable factfinder could find that the plaintiff was subjected to quid pro quo sexual harassment. The defendant's motion for summary judgment should be granted with respect to this claim under Title VII.

### 4.   Retaliation

Title VII prohibits an employer from "discriminat[ing] against" an employee because the employee "opposed any practice" prohibited by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" undertaken pursuant to Title VII.  42 U.S.C. 2000e-3(a); see White, 126 S.Ct. at 2410.  To establish a prima facie case of retaliation in violation of Title VII, the plaintiff must prove three elements by a preponderance of the evidence.  First, the plaintiff must show that she engaged in an activity protected under the statute.  Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006).  A protected activity is any activity provided for by either the participation clause or the opposition clause

---

[16]The plaintiff, in her sur-reply brief, contends that the tangible action was the defendant's failure to pay her the same wage rate as Mr. Grosner. "The condition or privilege of employment was obviously a pay raise to be paid on an equal basis with Jay Grosner since she was doing the same work as he was." (Doc. No. 41 at 2-3.) As discussed below, the court finds no merit to the plaintiff's argument concerning equal pay.  Additionally, the court notes that the plaintiff does not identify her alleged constructive discharge as the tangible action, thereby waiving the argument; however, even had she raised the argument, as discussed below, the court finds the constructive discharge claim unproven.

of the statutory language. Id. at 341 (citing 42 U.S.C. § 2000e-3(a)). "'[I]nformal protests of discriminatory employment practices, including making complaints to management'" constitute opposition. Id. at 343 (quoting Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006). "Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." Id. (citing Clark County v. Breeden, 532 U.S. 268, 271 (2001) (per curiam)). Furthermore, the employee's opposition must be unequivocal. Id.

Second, the plaintiff must show that she suffered a materially adverse action.[17]  White, 126 S.Ct. at 2414-15. Material adversity means that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation omitted). An action is material if it is significant and not trivial. Id. at 2415. An action is significant if it interferes with an employee's "'unfettered access' to Title VII's remedial mechanisms" by being "likely 'to deter victims of discrimination from

---

[17]The parties understandably argue that the second element of a prima facie case of retaliation is an adverse employment decision. While this until recently had been correct in the Third Circuit, among others, see White, 126 S.Ct. at 2410 (citing cases, including Robinson, 120 F.3d at 1300), on June 22, 2006, the Supreme Court in White expressly rejected the adverse employment element in a Title VII case. 126 S.Ct. at 1214-15.

complaining to the EEOC,' the courts, and their employers." Id. (quoting Robinson v. Shell Oil, 519 U.S. 337, 346 (1997)).  An action is trivial, i.e., it will not deter an employee from pursuing her rights, if it is related to "those petty slights or minor annoyances that often take place at work and that all employees experience." Id.; see id. ("Title VII, we have said, does not set forth 'a general civility code for the American workplace.'") (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).  This includes a "simple lack of good manners." Id.

The reasonableness of the material adversity standard means that the standard is objective. Id. It entails an investigation by the court into the "particular circumstances" of the claim. Id.; see id. ("Context matters.").  But "this standard does not require a reviewing court or jury to consider 'the nature of the discrimination that led to the filing of the charge.'" Id. (quoting id. at 2420 (Alito, J., dissenting)).  Instead, the court must focus solely on the alleged retaliatory action. Id.

Finally, the plaintiff must show that the materially adverse decision was causally related to the protected activity. Moore, 461 F.3d at 341-42; see id. at 342 ("Many may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief.") (quoting Jensen, 435 F.3d at 449) (omission in original).

The causal relationship identifies the "retaliatory animus."[18]   Id. (quoting Jensen, 435 F.3d at 449-50).

Here, the court finds that there is no genuine issue of material fact as to whether the plaintiff was retaliated against by Mr. Czarnecki. There is evidence that the plaintiff opposed Mr. Czarnecki's alleged harassment, thus establishing the first element for the purposes of the motion. However, the plaintiff has failed to identify by substantiated evidence any materially adverse action taken in retaliation for her opposition. The plaintiff contends that her constructive discharge was the retaliatory action. While a constructive discharge may support a claim of retaliation, as discussed below, the court finds that there is insufficient evidence supporting the plaintiff's claim of constructive discharge.  She also alleges that Mr. Czarnecki retaliated against her after she resigned, but those claims are not linked to any materially adverse action. Accordingly, the court finds that no reasonable factfinder could find that the defendant retaliated against the plaintiff for her opposition to Mr. Czarnecki's alleged harassment. The defendant's motion for summary judgment should be granted with respect to the plaintiff's Title VII claim of retaliation.

---

[18]If the plaintiff succeeds in establishing a prima facie case of retaliation, the court then considers steps two and three in the familiar McDonnell-Douglas burden-shifting paradigm.  Moore, 461 F.3d at 342. Here, however, the defendant's have not advanced an argument beyond the prima facie case. Therefore, the court will consider only the prima facie case.

## B.    The EPA

The EPA generally prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . ." 29 U.S.C. § 906(d)(1).  A claim under the EPA in analyzed under a modified, two-step McDonnell-Douglas burden-shifting paradigm. Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000).  First, the plaintiff must establish a prima facie case showing that "employees of the opposite sex were paid differently for performing 'equal work'–work of substantially equal skill, effort and responsibility, under similar working conditions."  Id.

Next, if the plaintiff establishes a prima facie case, then the burden of persuasion shifts to the employer, who must prove the existence of one of the four statutory affirmative defenses.  Id.  The EPA provides that an employer may pay disparate wages if "payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."  29 U.S.C. § 906(d)(1).  The fourth reason serves as a catch-all. It allows an employer to pay disparate wages for any reason unrelated to sex, whether "reasonable or unreasonable."  Smith v. City of Jackson, Mississippi, 544 U.S. 228, 239 n.11 (2005).  The employer must show "so clearly that no

rational jury could find to the contrary" that the proffered defenses "do in fact explain the wage disparity."[19] Stanziale, 200 F.3d at 107-08 (emphasis in original); see id. at 108 ("[W]here, as here, employers seek summary judgment as to the Equal Pay Act claim, they must produce sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains.").

Here, the court finds that the plaintiff has failed to show that the defendant discriminated against her by paying her unequally in comparison to Mr. Grosner. The court is unable to determine, as a matter of law, that the plaintiff cannot establish a prima facie case under the EPA. The evidence indicates that the plaintiff was a foreman on at least one occasion, but is unclear as to whether her duties were substantially similar to Mr. Grosner's as a permanent landscape designer. Furthermore, the defendant denies that the plaintiff was even a foreman.

It is clear, though, that Mr. Grosner was paid more than the plaintiff. However, the court finds that the defendant has clearly substantiated a permissible basis for the pay disparity. The record is unequivocal that Mr. Grosner was more qualified than the plaintiff on the basis of his vocational

---

[19]Thus, the employer's bar is higher in an EPA claim than in discrimination claims under employment laws such as Title VII, the Americans with Disabilities Act, or the ADEA, in which the employer must show "merely that the employer's proffered reasons could explain the wage disparity." Stanziale, 200 F.3d at 107-08 (emphasis in original).

education, many years of experience, and fertilizer license. In spite of the experience she may have gained in her personal life, the plaintiff, in contrast, had only sixteen months of gardening center experience, none of which was devoted exclusively to landscape design.  In addition, she lacked a fertilizer license.  Accordingly, the court finds that no reasonable factfinder could find that the defendant discriminatorily paid the plaintiff less than Mr. Grosner. The defendant's motion for summary judgment should be granted with respect to the plaintiff's claim concerning Mr. Grosner under the EPA.

However, the court must reach an opposite conclusion concerning Mr. Elliott.  Although the plaintiff did not specify in her complaint that her EPA claim arose from a pay disparity with Mr. Elliott, the record and the plaintiff's brief in opposition to the instant motion make clear that she alleges that she was paid less that Mr. Elliott. The defendant has not raised any argument concerning Mr. Elliott's qualifications in comparison to the plaintiff's. Accordingly, the court is unable to address the EPA claim against Mr. Elliott. The defendant's motion for summary judgment should be denied with respect to the plaintiff's claim concerning Mr. Elliott under the EPA and the plaintiff's complaint proceed to trial on this claim.

40

### C.    Constructive Discharge

Title VII allows a plaintiff to raise a claim of constructive discharge. Suders, 542 U.S. at 142-43; Suders, 325 F.3d at 443-44.  The test is objective in light of the totality of the circumstances.  Suders, 542 U.S. at 141; Suders, 325 F.3d at 444-445.  An employer is liable for constructive discharge when it knowingly allows the plaintiff to endure such intolerable working conditions that "a reasonable person in the employee's position would have felt compelled to resign."  Suders, 542 U.S. at 141, 147; see Suders, 325 F.3d at 443-44 ("[A]cts of discrimination in violation of Title VII can make working conditions so intolerable that a reasonable employee would be forced to resign.") (quoting Goss v. Exxon Office Sys. Co., 747 F.2d 885, 887 (3d Cir. 1984)).  The plaintiff must show that "the alleged discrimination surpasses 'a threshold of "intolerable conditions"'" such that it was foreseeable that a reasonable employee would have felt compelled–that is, "would have had no choice but"–to resign rather than endure them.  Suders, 325 F.3d at 444 (quoting Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 169 (3d Cir. 2001); Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir.1998) (internal quotation omitted)).  The Third Circuit has identified a nonexhaustive list of "several situations that may be indicative of constructive discharge, including: (1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and, (6) unsatisfactory

41

job evaluations."  Id. at 445 (citing Clowes v. Allegheny Valley Hosp., 991

F.2d 1159, 1161 (3d Cir.), cert. denied, 510 U.S. 964 (1993)).  In addition, the

court may consider whether the plaintiff considered options other than

resignation because "a reasonable employee will usually explore such

alternative avenues thoroughly before coming to the conclusion that

resignation is the only option." Id. at 445 (quoting Clowes, 991 F.2d at 1161).

On the basis of the case law, the Third Circuit has stated that two elements

must converge to establish a constructive discharge: the plaintiff suffered

intolerable harassment that would drive a reasonable person to resign; and,

the plaintiff's resignation under the circumstances was reasonable.[20] Id.

Here, the court finds that there is no issue of material fact as to whether

the plaintiff was constructively discharged.  The plaintiff purports that she was

constructively discharged because of the hostile work environment, the quid

pro quo harassment, and the pay disparity. However, the record only supports

a finding that the plaintiff resigned because she earned less than Mr. Grosner.

There is a dearth of contemporaneous evidence in the record supporting the

plaintiff's claim that she felt compelled to resign because of the sexual

---

[20]The Supreme Court vacated the judgment and overruled the Third
Circuit in Suders with respect to the Court of Appeals's ruling on an
employer's recourse to affirmative defenses in a hostile work environment
claim predicated on vicarious liability, not with respect to the elaboration of a
constructive discharge claim by the Third Circuit and other Courts of Appeals,
as discussed here. See Suders, 542 U.S. at 139-41, 143, 146-49, 152.  The
Supreme Court required that such a claim accord with its ruling in Ellerth.
See supra, nn.11, 15.

harassment or that her resignation was even informed by it, and the plaintiff's claims to the contrary appear to be ex post facto rationalizations. The plaintiff made it quite clear at the time of her resignation that she was upset at being paid less than Mr. Grosner and that she was leaving its employ because of the disparity. But, as discussed above, Mr. Grosner was more qualified than she and was reasonably paid more on the basis of his superior qualifications. Under the totality of the circumstances, no reasonable person could objectively find the pay disparity intolerable. Even were the plaintiff as qualified as Mr. Grosner and the pay disparity, therefore, more likely unlawful, such a disparity would not without more rise to the high threshold of a constructive discharge.  None of the indicia of a constructive discharge are present.  The defendant did not threaten the plaintiff with discharge, encourage her to resign, reduce her pay or benefits, give her a less desirable job or duties, or poor evaluations.  Indeed, the defendant in effect promoted the plaintiff when it allowed her to work on landscaping projects and gave her a raise, which was not customary at the defendant.  In addition, the plaintiff's evaluations were excellent. The court notes that the only "suggestion or encouragement of resignation" on record is the plaintiff's in her statement on her last time card.

Finally, there is no indication that the plaintiff reasonably explored alternatives to resigning.  There are two events in the record showing that the plaintiff raised the issue to anyone at the defendant. First, the plaintiff

complained to Ms. Blandina in mid-August.  But Ms. Blandina explained that Mr. Czarnecki was the only person who could determine the plaintiff's pay rate and she could not help the plaintiff, even if she wanted to. Second, the plaintiff demanded a raise from Mr. Czarnecki after he returned from vacation and resigned the same day. These episodes do no indicate a reasonable consideration of alternatives.  Accordingly, the court finds that no reasonable factfinder could find under the totality of the circumstances, that the plaintiff was constructive discharged. The defendant's motion for summary judgment should be granted with respect to the plaintiff's constructive discharge claim and the plaintiff's complaint be dismissed with respect to this claim.

### D.   IIED

The Pennsylvania Supreme Court has not yet recognized the tort of intentional infliction of emotional distress ("IIED"), but the Superior Court has and the Third Circuit has predicted that the Supreme Court would adopt the RESTATEMENT (SECOND) OF TORTS § 46, which provides, "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Clark v. Township of Falls, 890 F.2d 611, 622-23 (3d Cir. 1989) (citing Kazatsky v. King David Mem'l Park, Inc., 515 Pa. 183 (1987)).  Outrageous or extreme conduct is behavior so outrageous or so extreme as to go "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable

44

in civilized society." Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988); Swisher v. Pitz, 868 A.2d 1228, 1230 (Pa.Super. 2005) (internal citation omitted). "Pennsylvania courts have been chary to declare conduct 'outrageous' so as to permit recovery," and "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery." Cox, 861 F.2d at 395-96 (stating that terminating an employee with an "improper motive and notwithstanding the potential effects" on him was not outrageous). In addition, the harm suffered by a plaintiff must go beyond mere emotional distress and include some physical injury. Swisher, 868 A.2d at 1230. The alleged severe emotional distress must be "supported by competent medical evidence." Kazatsky, 515 Pa. at 197.

Here, the court finds that the plaintiff has not adduced any of the requirements to establish a genuine issue of material fact so as to state a claim for IIED. The defendants' alleged conduct would not qualify as outrageous or extreme under Pennsylvania's and the Third Circuit's jurisprudence. The plaintiff has failed to allege either severe emotional distress or any related physical injury.  Finally, she has not produced any medical evidence to substantiate a claim of emotional distress. Accordingly, the court recommends that the defendant's motion for summary judgment be granted with respect to the plaintiff's claim that the defendant intentionally inflicted emotional distress and the plaintiff's complaint be dismissed with respect to this claim.

**V.**   **Conclusion**

On the basis of the foregoing, **IT IS RECOMMENDED THAT**:

(1).   the defendant's motion for summary judgment be **DENIED** with respect to its argument that it is not a Title VII employer;

(2).   the defendant's motion for summary judgment should be **DENIED** with respect to the plaintiff's claim that she was subjected to a hostile work environment and the plaintiff's complaint proceed to trial on count one;

(3).   the defendant's motion for summary judgment should be **GRANTED** with respect to the plaintiff's quid pro quo claim under Title VII and the plaintiff's complaint be **DISMISSED** with respect to count two;

(4).   the defendant's motion for summary judgment should be **GRANTED** with respect to the plaintiff's Title VII claim of retaliation and the plaintiff's complaint be **DISMISSED** with respect to count three;

(5).   the defendant's motion for summary judgment should be **GRANTED** with respect to the plaintiff's EPA claim concerning Mr. Grosner and the plaintiff's complaint be **DISMISSED** in part with respect to count four;

(6).   the defendant's motion for summary judgment should be **DENIED** with respect to the plaintiff's EPA claim concerning Mr. Elliott and

the plaintiff's complaint proceed to trial, in part, with respect to count four;

(7).     the defendant's motion for summary judgment should be **DENIED** with respect to the plaintiff's PHRA claim and the plaintiff's complaint proceed to trial on count five;

(8).     the defendant's motion for summary judgment should be **GRANTED** with respect to the plaintiff's constructive discharge claim and the plaintiff's complaint be **DISMISSED** with respect to count six; and,

(9).     the defendant's motion for summary judgment should be **GRANTED** with respect to the plaintiff's claim that the defendant intentionally inflicted emotional distress and the plaintiff's complaint be **DISMISSED** with respect to count seven.

s/  Malachy E. Mannion
**MALACHY E. MANNION**
**United States Magistrate Judge**

Date: February 23, 2007
O:\shared\REPORTS\2005 Reports\05-0566.01.wpd

47